NEW PROGRESSIVE PARTY *v.* COMMONWEALTH BOARD OF ELECTIONS; PEOPLE PARTY *v.* COMMONWEALTH BOARD OF ELECTIONS; FEDERAL UNIONIST AGRARIAN PARTY, Intervener in both appeals.

Nos. 16, 17.        Decided August 12, 1968.

938

*Jorge Luis Córdova Díaz, Francisco Ponsa Feliú, Enrique Córdova Díaz, Carlos Romero Barceló, Ángel Viera Martínez,* and *Juan Antonio Palerm* for the New Progressive Party. *Rafael A. Rivera Cruz,* Solicitor General, *J. F. Rodríguez Rivera,* Deputy Solicitor General, and *Samuel R. Quiñones* for the Commonwealth Board of Elections. *Vicente L. Giménez,* member of the Commonwealth Board of Elections, representing the People Party. *Ángel Roberto Díaz* for the Federal Unionist Agrarian Party.

DECISION OF MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ.

## I

These appeals present a political controversy which comes to the judicial forum from a political administrative forum —the Commonwealth Board of Elections—whose decisions must be based on the full effectiveness of the status of Law, and on the protection of political and social rights which come into play in the administration of the Election Law, and not on political preferences—despite its eminently political organization.

In the function of passing judgment, whether in boards and other administrative bodies with quasi-judicial powers, or in the properly judicial forum, it is the men of Law who are called upon, more than ever to overcome—with thoughtful judgment and freedom of conscience in their judicial

determinations—the public histerias that run in step with political passions, assuming the responsibility of reaffirming the rights of man in the juridical-constitutional sphere in order to give to the mandate of the law a valid sense of social utility.

## II

For a better understanding of the questions involved herein, it is necessary to make a summary—the briefest possible—of the antecedents which form a part of the background of these appeals, of the applicable provisions of law, and of other facts and actions which appear from the record sent by the Board to the Chief Justice, under the provisions of § 13d of the Election Law, or which are properly of judicial notice.

On July 23, 1967, a plebiscite was held in Puerto Rico, for the people of Puerto Rico to express its will as to its political status, pursuant to the provisions of Act No. 1 of December 23, 1966, as subsequently amended. It was provided by § 1 of said Act, among other things, that "Such plebiscite shall be held in a free, impartial and democratic manner in order that the electors qualified to vote therein may choose among:

(a) Commonwealth

(b) Statehood

(c) Independence."

It was provided by the first paragraph of § 3 that:

"Except as otherwise expressly provided in this act, the voting process in the plebiscite shall be conducted in accordance with the provisions of the Election Law, which shall be understood to be supplementary to this act, and in accordance with the rules and regulations established in the past by the Commonwealth Board of Elections which are compatible with this act or with the rules and regulations approved by the Commonwealth Board."

Section 4 established the requirements and conditions so that each political party having in its program a specific status formula, could actively participate in the plebiscite in support of said formula as its exclusive representative; and it provided, in default thereof, a mechanism for the co-participation of other groups, organizations or entities which, although not in the category of political parties, would desire to participate to defend any of the status formulas if the party which had it in its program did not notify the General Supervisor of Elections, within 30 days from the date of approval of the Act, of its purpose to participate in its support, but did so within the next 30 days after expiration of said period; or of substitution, if said party would completely abstain itself from participating in the plebiscite. In such a case, the designation of a Directing Committee, representative of the corresponding status formula in the manner provided therein, was authorized.

Section 19 provided that the Supervisor would award to each status formula, by drawing of lots, (1) a royal palm tree, (2) a cart wheel, (3) a mountain. It was also provided by said section that "no official emblem characteristic of a political party shall be included in the ballot."[1]

Section 26 provided that:

"The emblems appearing on the ballots used in the plebiscite may not be used by any candidate or party as such on a ballot from the date of approval of this act until ten years after the plebiscite has been held."

---

[1] "Section 95 (k) 'Official characteristic emblem'.—Any device, image, type, figure, sign, mark, drawing, distinctive mark, pictorial or photographic representation or reproduction, flag, coat of arms, name, motto, letter or combination of letters, word or combination of words, or any other material, that may have been registered, prior to the approval of this act until the closing of the polling places for the plebiscitary canvass, in the Commonwealth Board of Elections, as official emblem of any political party, registered or in process of registration."

And § 86 provided that:

"It shall be unlawful for any person and/or any political party or body thereof, group, organization, or political entity, committee representing one of the formulas enumerated in section 1 of this act, or committee affiliated with or subsidiary of the said representative committee, and any person acting in representation or in behalf of said entities, to use any official characteristic emblem, as defined in this act, for or against any of the formulas enumerated in section 1 of this act within the polling places or within a radius of less than one hundred (100) meters from said polling places."

Said section also provided that if the previous provisions were violated, it would constitute a misdemeanor punishable by the penalty provided therein.

The Popular Democratic Party participated in the plebiscite for the Commonwealth formula contained in its program; seven groups participated for the Statehood formula, composed by—in accordance with the provisions of the very Act—a Directing Committee representative of said formula; and two groups, also constituted by a Directing Committee representative of the same, participated for the Independence formula.

For the purposes of the plebiscite, in accordance with the pertinent provisions of the Act, the Commonwealth Board awarded, by drawing lots, the emblem of the royal palm tree to the Statehood formula, the emblem of the cart wheel to the Independence formula, and the emblem of the mountain to the Commonwealth formula. The ballots used in the plebiscite were thus printed, and the other requirements provided by the aforesaid Act were also complied with.

## III

In a letter dated August 1, 1967, which was received in the Commonwealth Board of Elections at 12:31 p.m. of that day, Modesto Rivera Ramos, signing as Chairman of a

political group which he named Federal Unionist Agrarian Party, wrote the General Supervisor of Elections requesting the Board to take "official notice of the name and emblems which I am using in the registration process of a new political party by petition," which shall have the name already indicated, and which would have as emblems a banana plant, a flamboyant tree, a coffee tree, and two coconut palm trees, including, as part of the letter, four drawings thereof in horizontal sequence in the order mentioned. He indicated in said letter that he would begin to file with the Board "the petitions for registration of the new party by petition as soon as we receive them from the electoral precincts where the work has been initiated, beginning with precinct number one of San Juan, and continuing with the other precincts of Puerto Rico." He finished requesting that in order to swear to the petitions for registration of the new party, two notaries be designated from the four following names which he included in his letter: Gonzalo Ardín Román, Ángel Roberto Díaz, Ángel L. Delgado, and Arturo Ortiz Toro.

From the photocopy of said letter, sent as part of the Board's record, as well as from the sample ballot corresponding to the general elections of November 3, 1964, which also forms a part of the record, the first three of the four drawings, submitted as emblems in the aforementioned letter, are the same ones used in said ballot as their emblems, by Representative at Large Santiago Iglesias Silva (banana plant), Representative at Large Aguedo Mojica (flamboyant tree), and Senator at Large Ramiro L. Colón (coffee tree), which had been evidently cut off or photocopied from said ballot and which had been superposed on the aforesaid letter.

Together with a letter of August 2, 1967, and received in the Board at 12:08 p.m. of that day, Emilio Matos Ríos, signing as acting chairman of a political group which he named Federate Progressive Party, accompanied 42 petitions of "bona-fide voters of the electoral Precinct of Culebra,

requesting the registration of the Political Party 'Federate Progressive'."[2] Said letter was also accompanied by the record of the sworn statements executed before Notary Juan A. Palerm, by the petitioner voters. It was stated in said letter that the emblems of said Party would be a royal palm tree, a coconut palm tree, and two palm branches in V-form. The mimeographed petitions for registration contained in the upper part, in that order, mimeographed drawings of said emblems.

The photocopy of the receipt issued in the name of the Board by Salvador Díaz, affirms that the 42 petitions of the precinct of Culebra, in the name of said Party, were received on August 2, 1967, at 12:08 of that day.

On August 2, the Board received at 1:38 p.m., according to the receipt in the record, a letter addressed to the Supervisor, dated August 2, 1967, signed by Modesto Rivera Ramos, as Chairman of the Federal Unionist Agrarian Party, but followed by a note stating "by Ángel Roberto Díaz, official Notary who administered the oaths," together with the petitions of Blanca González Vélez and Teddy Libertad Cancel González, of the election precinct of San Juan I, signed in San Juan before Notary Arturo Ortiz Toro, on August 1, 1967.

Four petitions for registration of the aforesaid party in the precinct of Culebra, were received with a letter addressed to the Supervisor, dated August 3, 1967. These four petitions were signed in Culebra before Notary Ángel Roberto Díaz on August 1, 1967.

The four aforesaid petitions—of Herminia Santiago Navarro, Isabel Navarro Ramos, Inocencia Soto Ayala, and

---

[2] On April 17, 1968, Anastasio Soto Ayala, as voter of the Precinct of Culebra, signed a sworn statement challenging the 42 petitions for registration of the group Federate Progressive Party in said precinct, because they were void *ab initio*.

There is nothing in the record to indicate that this challenge was at least considered by the Board.

Nicomedes Ayala Serrano—in addition to nominating candidates for Governor, Resident Commissioner, District and at Large Senators and Representatives, nominated *five* candidates for Municipal Assemblymen (instead of four, as provided by the Municipal Law), and did not nominate any candidate for Mayor. One of the candidates for the Municipal Assembly, whose petition for nomination of candidates is among those four, stated in his petition that he did not know how to read, and he did not sign his oath therein, but made a cross.

In those four petitions, Modesto Rivera Ramos (President), Juan Velázquez Zayas (Vice-president), Agustín Bayón Santiago (Secretary), and Aminta Rosario Troche (Treasurer), were designated to constitute the Central Directing Body of said group. All of them lived in San Juan, as it was set forth.

Twenty-one more petitions were sent with a letter dated August 5, 1967, in the name of said group, signed by the petitioners on the fourth and fifth days of said month in Culebra, before Notary Ángel Roberto Díaz. They nominated the same previous four candidates, and the same Central Directing Body. Until that date the aforesaid group Federal Unionist Agrarian Party had filed with the Commonwealth Board of Elections two (2) petitions nominating candidates for the precinct of San Juan I, and twenty-five (25) petitions nominating candidates for the precinct of Culebra.[3]

Together with a letter dated March 27, 1968, addressed to the General Supervisor of Elections, the aforesaid group

---

[3] In Culebra, where the total number of voters who voted for the office of Governor was 317, 32 valid petitions are needed—10%—in order to nominate local candidates. On March 14, 1968 the General Supervisor of Elections stated before the Superior Court of Bayamón, according to the record sent by the Board, that the 25 petitions of the group Federal Unionist Agrarian Party for the precinct of Culebra had been processed and accepted, and that since the law requires only sixteen (16), that is 5%, said group, "for the purposes of the Board, is registered in the Precinct of Culebra and as such it has to appear in the ballots."

sent eleven (11) additional petitions for the precinct of Culebra, signed on the 26th of the same month before Notary Francisco Navarro Mendía. Two of the eleven petitioners— Ada Laura Rodríguez Díaz and Anastasio Soto Ayala—had already signed on August 1, 1967, petitions nominating candidates by the same group, and for the same precinct before Notary Ángel Roberto Díaz, and they are among the petitions filed with the Board on August 5, 1967, for which reason the total number of voters signing petitions is thirty-four (34), and not thirty-six (36). On the other hand, there is a difference between the first 25 petitions and the following eleven, consisting in that in the latter, *Ana* Santiago Navarro is nominated as member for Municipal Assembly of Culebra and not *Herminia* Santiago Navarro, who was nominated in the first twenty-five, and neither Herminia nor Ana—who individually would not have sufficient voters to complete the 32 petitions necessary to be nominated—signed the oath of acceptance required by law, but the oath filed with the Board on May 31, 1968 was signed by *María* Santiago Navarro, who does not appear as candidate in any petition whatsoever.

Isabel Navarro Ramos, who signed a petition for registration of candidacies in the name of the Federal Unionist Agrarian Party on August 1, 1967, signed another one with other candidates on August 2 in the name of the Federate Progressive Party; Elvira Romero García, Antonio Ramos Román, and Leonides Espinosa Alméstica, who signed petitions in the name of the Federate Progressive Party on August 2, 1967, signed others in the name of the Federal Unionist Agrarian Party, on August 4 the first two, and on August 5 the latter.

On June 5, 1968, the General Supervisor of Elections certified that the political group named Federal Unionist Agrarian Party had 36 petitions for registration of voters for the election precinct of Culebra, "which qualifies it as

local party and with a right to appear in the ballot in the general election of 1968 in said Election Precinct"; and on July 29, 1968, he certified that none of the petitions of the candidacies filed by said political group was denied by the Commonwealth Board of Elections "since they were processed, and everyone who took the oath, and signed them are legal voters of the Election Precinct of Culebra, and said petitions meet all the requirements of the Act."

By a letter of August 21, 1967, Magdalena López, as Secretary of the political group named Federate Progressive Party—who in addition to having filed before the Commonwealth Board of Elections forty-two (42) petitions nominating candidates for the election precinct of Culebra, as we previously stated, filed 870 petitions for the precinct of Cataño, which were accepted, according to a statement of the Supervisor which appears in the record—asked the Commonwealth Board to leave as the only emblem of said group the coconut palm tree,[4] and to eliminate the royal palm tree and the two palm tree branches which it had been using till then in the petitions for registration of candidates. The Board denied this request, among other reasons which we need not mention here, on the ground that the emblem pro-

---

[4] Since it is unnecessary, we do not mention herein the request for changing the name of the group. She also requested in said letter that the directing board, which appeared in the petitions for registration filed for the precincts of Cataño and Culebra, be substituted in the following manner:

"A—President, Luis A. Ferré, in substitution of Emilio Matos Ríos.
B—First Vice-president, Justo A. Méndez in substitution of Antonio Roig Ferré.
C—To add four Vice-presidents, to wit:
    Mr. Carlos Romero Barceló
    Mr. Jorge Luis Córdova Díaz
    Mr. Jesús Hernández Sánchez
    Dr. Hernán Padilla
D—General Secretary, Mr. José Menéndez Monroig in substitution of Magdalena López.
E—Treasurer, Federico Torres Campos, in substitution of Gabriel Cánovas."

posed "violates the provisions of law which expressly prohibit a political group from adopting fully or partly a name or emblem which violates the clear provisions of §§ 37 and 42 of the Election Law in force."

Emilio Matos Ríos filed a petition for review against the decision of the Board before the Superior Court and, after various incidents, the Bayamón Part, speaking through Judge Jorge Meléndez Vela, rendered judgment on February 13, 1968 granting the review, ordering the Board to register the political group to which Matos Ríos belonged, with the proposed name and the emblem of the coconut palm tree, after the sworn statements of the members of the new directing board appointed were filed in the Board accepting said designation, and by the original members of the Central Directing Body certifying under oath the agreements reached by them, and to which the letter, of August 21, 1967, of the former Secretary Magdalena López, referred to. In the opinion rendered by said judge, he stated that the emblem of the coconut palm tree in no way violated § 26 of the Plebiscite Act, nor § 37 of the Election Law in its pertinent part.

Various incidents subsequent to the judgment followed, before the same court: Petition for Intervention of Modesto Rivera Ramos[5] in the name of the group Federal Unionist Agrarian Party, and a Motion to set aside the judgment, in the name of the Commonwealth Board of Elections; and both motions having been denied, the latter and the former appealed before the Supreme Court by way of Certiorari Nos. O-68-120 and O-68-142.

By judgment of June 28, 1968 the Supreme Court quashed the writ of certiorari issued in petition No. O-68-120 to

---

[5] We shall not mention, in the course of this decision, the other petitioner in the petition for intervention and in the petition for Certiorari O-68-120 before the Supreme Court, because his request became academic during the proceeding.

review the refusal of the Superior Court of Bayamón to permit the intervention of Modesto Rivera as President of the Federal Unionist Agrarian Party; and in the Certiorari O-68-142, issued at the request of the Commonwealth Board of Elections, the order appealed from, of May 6, 1968, was set aside, and it was decreed that the judgment of the Superior Court of Bayamón of February 13, 1968, was "inefficient, devoid of effectiveness, and non-workable." It was expressly set forth in the opinion of the Supreme Court that said decision "in no way prejudges in one sense or another, the right which the New Party, represented in the Board, may or may not have to claim before the Board the use of the coconut palm tree as emblem in the electoral ballot, nor prejudges in any manner the decision the Board may enter, if such petition were made."

## IV

At the end of August 1967, the group United Statehood which participated in the plebiscite held July 23 of that year, in support of the Statehood formula, initiated the separate registration of a party by petition to go to the general elections of 1968, under the name of New Party and with a horseshoe emblem.

On September 11, 1967 it filed in the Commonwealth Board of Elections 310 petitions corresponding to the election precinct of Cayey. It finished its registration process, and in January 1968 it was certified as party by petition, with the right to nominate candidates in all the precincts of the Island, and to enjoy all the other rights which the law acknowledges to the parties by petition.

According to a testimony given in the Superior Court of Bayamón, by the President of the New Party, in one of the incidents to which we have referred, within the petition for review taken by Emilio Matos Ríos—and which forms part of the record in the present appeal—the idea of creat-

ing a political party by petition was conceived by the Directors of the United Statehood right after the plebiscite was held, which idea was ratified in a general assembly of said group; and the initial step of registering the Federate Progressive Party in Culebra was part of the same movement, to prevent the Statehood Republican Party, which did not go to the plebiscite, from obtaining the emblem of the coconut palm tree through a local party of its own making, like the Federal Unionist Agrarian Party, in a surprise movement which had no other purpose but to preclude the United Statehood, after becoming a party by petition, from adopting it as its emblem, "which was of great importance for us."

## V

In a letter of March 26, 1968, filed with the Commonwealth Board of Elections on the following April 5, the General Secretary of the New Party requested the Board, by virtue of the documents which accompanied his letter, to change the name New Party to New Progressive Party, and the change of the emblem to that of the coconut palm tree, with the slogan over it of "Security, Equality, and Progress."

In a letter of April 8, 1968, the General Supervisor of Elections answered the General Secretary of the New Party, that because the petition taken by Emilio Matos Ríos against the Commonwealth Board of Elections—to which we have referred before—was pending in the Superior Court, Bayamón Part, he believed that it would be improper to bring his request under consideration of the Board at that time.

When the appeals of Certiorari O-68-120 and O-68-142 were decided by the Supreme Court, with the pronouncements previously set forth, the alternate member of the New Party requested the Commonwealth Board of Elections to

meet and consider the petition of change of name and emblem which had not yet been decided.

## VI

At a meeting held by the Board on July 8, 1968 to consider the New Party's request, it was agreed to authorize the change of name to New Progressive Party, but the request of change of emblem was not decided, because the Supervisor believed, after submitting said matter to a vote and there being no unanimity among the members of the Board representing the political parties, that he should not render his opinion on the legality or illegality of the use of the coconut palm tree in the ballot of 1968, because the question was sub judice in a proceeding for declaratory judgment filed in the Superior Court, San Juan Part, by the Statehood Republican Party.

The Board representatives of the New Progressive Party and the People Party feeling aggrieved, appealed before the Chief Justice under the provisions of § 13d of the Election Law in force. After a hearing held on the past July 19, we remanded the case to the Board with instructions that it should render its decision on the legality or illegality of the use of the coconut palm tree as emblem in the ballot; and at the same time to decide the conflicting claims which the People Party, or any other political group could set up against the New Progressive Party in case it were finally decided that the use of said emblem were legal.

At a meeting of the Board held on July 22, since there was no unanimity among the members representing the political parties on any of the two questions, the Supervisor, pursuant to the provisions of the law, delivered his decision sustaining that the use of said emblem was illegal; and that in case that it would be decided on appeal that it was not illegal, said emblem would belong to the political group named Federal Unionist Agrarian Party, by priority.

The New Progressive Party and the People Party appealed again before the Chief Justice, within these very petitions. The group Federal Unionist Agrarian Party requested intervention, which was granted, and on July 30 a hearing was held in which all the parties interested therein were heard.

## VII

Section 37 of the Election Law in force (16 L.P.R.A. § 112) provides in its pertinent part: ". . . No political group wishing to register a candidacy or to be constituted into a party by petition shall use or adopt in whole or in part a name or emblem previously used or adopted *by any other political party*, or any name or emblem *in whole or in part similar to a name or emblem previously used or adopted by another political party*, if such other party still claims or uses such name or emblem. *Neither shall there be used or adopted any name, emblem or insignia whose use for election purposes is prohibited by law.*" (Italics ours.)

And § 42 of the very law (16 L.P.R.A. § 141) provides: *"No political party* shall adopt as a name or emblem a name or emblem which has been previously used or adopted *by another political party*, either in whole or in part, if such other party still claims and uses such name or emblem. . . ." (Italics ours.)

The first question to be decided in these appeals is whether the *royal palm tree* having appeared in the plebiscite ballot as emblem awarded to the Statehood formula, the provision of § 26 of the Plebiscite Act which prohibits said emblem to be used by any candidate or party as such in any ballot until 10 years after the plebiscite has been held, precludes a political party from using as emblem the coconut palm tree, which is not the royal palm tree, in the ballot of 1968.

The decision of the Supervisor against the use of said emblem—which decision in accordance with the law is the

decision of the Board—is based on that "public policy is against the use of emblems and the names of political parties for the purpose of confusing the voters" and, therefore, the Plebiscite Act of 1966 should be interpreted in harmony with said public policy, pursuant to § 18 of the Civil Code, which provides that the "laws which refer to the same matter or whose object is the same, shall be interpreted with reference to each other." After making reference, in an explanatory opinion, to the provision of § 35 of the former Election Law of 1906, as amended in 1908, which established that "No device shall be selected which, in the opinion of the Secretary [of Puerto Rico] resembles too closely a device already selected by some other party," and after citing §§ 37 and 42 of the Election Law in force, which we have copied above, he referred to the statement of motives of Act No. 138 of June 30, 1961, amending the very § 42 of the Election Law, which enlarged and elaborated the restrictions which were in force till then, as to the use of devices in the ballot by political parties, all of which to support his assertion on the public policy as to that matter. I believe it is convenient to reproduce here the statement of motives which the Supervisor cites in his opinion:

"The emblems on the election ballot are for the purpose of permitting the voter, specially the one who cannot read or write, duly to identify the party he wishes to cast his vote for. This being the purpose for which they are used, such emblems should be chosen pursuant to statutory restrictions approved to said effect, in order to prevent the voter from becoming confused or that an advantage be indirectly granted to any of the participating parties, through the use of any particular emblem that may have, in the voter's mind, connotations other than should warrant the right to vote he is about to exercise.

"To guarantee that the voters will not become confused or feel compelled by motivations that are foreign to the election process proper, it becomes necessary to include in section 42 of

Act No. 79, approved June 25, 1919, as amended, known as the 'Election Law', more comprehensive provisions than those at present comprised in the statute. Such is the purpose of this act."[6]

The Supervisor then affirms that the legislative history to which he has referred "reveals the deep concern of the lawmaker that in the political campaigns and in the elections no emblems or names which are the same or similar to those of other candidates and parties be used"; and that "even though the emblem which represented in the plebiscite the alternative federate statehood was named 'royal palm tree' by the very law, the truth is that for the common voter the drawings representing a royal palm tree and a coconut palm tree are so similar that they can be easily confused." He stated his view that "this similarity situates both emblems within the spirit and prohibition of § 37 of the Election Law and the afore-cited § 26 of the Plebiscite Act," and

---

[6] The amendment added to § 42 of the Election Law by virtue of Act No. 138 of June 30, 1961, which contains said Statement of Motives, added the following to the number of emblems which the *political parties* could not use (till then the emblem which had been previously used or adopted by another political party, in whole or in part, if that other party still claimed and used said name or emblem, and the flag or the coat of arms of the United States or the Commonwealth of Puerto Rico):

". . . (1) any symbol, image, type, figure, insignia, sign, token, drawing, mark, pictorial, or photographic representation or reproduction, emblem, flag, coat of arms, name, motto, letter or combination of letters, word or combination of words, which any church or sect, denomination, order or religious congregation, established in Puerto Rico, or any lodge, or fraternal, professional, civic or social group, established in Puerto Rico, or any organization, group, association, or entity for religious purposes established in Puerto Rico, may have used, or uses as a mark of distinction or in its rites, services, meetings, activities, ceremonies, teachings, instruction, or propaganda; (2) any device resembling or similar, in whole or in part, to those specified in the preceding paragraph; . . . ."

The same recital was added to the emblems which until then were prohibited to the candidates at large.

As it may be seen, all the emblems included in the new and embracing prohibition did not refer to political views at all or to questions which could be connected with an election controversy.

he sustained that said public policy "of not initiating confusion in the voters, is a clear mandate that cannot be frustrated through subtleties." Making reference to the *dolus malus* of the Roman law, one of which forms was known as *subtilitas* (the adherence to the strict letter of the law in order to make of it a means to obtain an undue advantage) he states that "to seek to allege and establish differences where there are none and to thus frustrate the true fair sense of the election process is punishable."

The Supervisor also states in his vote that "the emblem of the palm tree—even considering the subtlety that a coconut palm and not a royal palm tree is involved—has a direct and inseparable relationship with the electoral use to which it was devoted in the past plebiscite, which might give rise to an unconscious association of its significance in the plebiscite, on the voter's part, in a general election, which has different aims and purposes from those of a plebiscite election," and that "this unconscious association would be a barrier to the free and conscious exercise of the right to vote." He adds that "a vote given under the circumstances which I have set forth would not have the element of free will which § 2 of Article II of our Constitution supposes and requires. The principal concern of the State and of this Board must be to give effectiveness to the express will of the voters, and to enable the voter to give his vote in accordance with his very conscience."

## VIII

The Supervisor included in his opinion, as a finding of fact, the statement that during the plebiscite campaign, for every effective purpose, the Puerto Rican voters did not have before them the emblem of the royal palm tree, but the emblem of a *palm tree*; and that on some occasions the drawing of the coconut palm tree was used in propaganda in favor of Statehood. As an example he included in the record

a photocopy of an advertisement which, as he stated, appeared in the edition of July 21, 1967 of the newspaper El Mundo. Hence, he infers that during the plebiscite campaign the coconut palm tree and the royal palm tree were the same thing.

In the photocopy of the aforementioned advertisement attached to the record (where there appears in typewriting in its upper left corner "p. 46, El Imparcial, July 21, 1967"), there appears a very deficient drawing—which may be rather classified as being a political cartoon or satire—which according to its imprint, was paid by "Friends of the Federate State." As the Supervisor himself certified, in the Directing Committee representing the "Statehood" formula status, there was no group with the name of Friends of the Federate State. A rule cannot be established from an isolated fact, not attributable to the official representatives of that status formula in the plebiscite campaign.

The fact that there is a newspaper with the name La Palma, as spokesman of the New Progressive Party (a copy of which, dated June 23, 1968 and which says "Vol. II— No. 2" was included in the record by the Supervisor), and in which there appears next to its name in the first page, the drawing of a royal palm tree; that the drawings or stickers of the royal palm tree, as the Supervisor stated, "continue appearing on the automobile windows and also on the campaign flags," and that during a recent organized protest in front of the building of the Commonwealth Board of Elections "the same flag which was used during the campaign was waved"—which is not prohibited by law—in no way detracts from or defeats the right to use the emblem of the coconut palm tree, which is not the royal palm tree, in the ballot; nor does the statement of the President of the New Progressive Party before the Bayamón Part of the Superior Court—to which we previously referred and from which the Supervisor cites in his explanatory vote—detract

from that right since if, as a question of law, there is no illegality in the use of the coconut palm tree as emblem in the ballot, none of the facts to which the Supervisor refers in his opinion can produce it.

## IX

The Supervisor's opinion—from which we have previously cited *in extenso*—represents the sophisticated effort of an erudite *justitia*, trained in the technical processes of the different schools of interpretative methodology, clothed with some juridical pomp of ancient age.

The prohibition of § 26 of the Plebiscite Act is of an imperative character, it contains within itself the compulsive element of *not doing*, and therefore, it must be restrictively construed in order not to encroach upon the electoral right of the citizen in its organizational expression —which can be reasonably regulated, but not annulled. The principle *inclusio unius est exclusio alterius* is applicable to this case to avoid the repeal of the specific provision of the law, not because of the mere presence in the Puerto Rican statutory interpretative methodology of the principle "that when the law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof"—§ 14 of the Civil Code—but because of the effectiveness, under our juridical-constitutional law, of the superior principle that a provision of law which may curb the freedom of political organization, in any of its manifestations, as part of the right to vote, should not be extended by administrative fiat or by judicial construction, beyond its own terms for the purpose of broadening the express prohibition contained therein.

The opinion of the Supervisor is based on that even when the emblem, which represented the status formula of Statehood in the plebiscite, was named "royal palm tree" by the

very law, the fact is that for the common voter, "the drawings representing a royal palm tree and a coconut palm tree are so similar that they can be easily confused" since, "for every practical purpose, both emblems are the same thing," therefore, if the use of the emblem of the coconut palm tree is authorized, one would be "perverting and denaturalizing the legislative intent which inspired the prohibition established in § 26 of the Plebiscite Act," an intent which in his opinion went "beyond reducing to three examples—the ones used in the plebiscite—the inventory of the possible principal emblems in the election issue" because "the guarantee of a clean electoral process free of confusions, and the protection which the vote deserves as a fundamental instrument of democracy," was in play.

Our democracy feeds itself on the currents of liberality, not on the currents of repression. The Supervisor incurs in a mixture of concepts, applied with an inconsistent criterion that restricts the right to the freedom of suffrage—which is the very essence of the procedures of democracy—limitations irrelevant to the express prohibitionist provision of law which is invoked, which have no other effect but to produce an evident regression in the scale of values of human rights.

There is no euphemistic refinement in the statement that a coconut palm tree is not a royal palm tree. The difference between both—which exist throughout the whole island—is easily grasped at first sight, and it is inconceivable that any person could mistake one for the other in their natural form. It has been insinuated, however, that if a coconut palm tree appears as emblem in the ballot, the size to which it would be reproduced would be reduced to such an extent that it would be difficult to distinguish it from, and easy to confuse it with a royal palm tree, which was the emblem used in the plebiscite in a greater size than the one in which it would appear in the ballot. The argument lacks

validity, because if the emblem proposed is the one of a coconut palm tree, the drawing, picture, engraving or reproduction which represents it in the ballot should offer at first sight the difference which exists in its natural form between the coconut and the royal palm tree, and the identity of the coconut palm tree can be easily appreciated in the ballot, even though the voters are not botanists.

The denial of the use of the coconut palm tree as emblem of a political party in the general elections of 1968 is not based—because that is not the case—on the fact that it is similar to the emblem of any of the other parties which are going to said elections. The denial is based on the theory that, for the common voter, the drawing representing a coconut palm tree can easily be confused with the drawing of the royal palm tree, which was the emblem used in the plebiscite to represent a status formula; on the unconscious association on the part of the voter in a general election with the significance of a similar emblem in the plebiscite, and on the thesis of coercion and lack of free will which that unconscious association can create in the vote of the voter, under which circumstances the latter would not have the element of free will underlying § 2 of Article II of our Constitution, which provides "The laws shall guarantee the expression of the will of the people by means of equal, direct and secret universal suffrage and shall protect the citizen against any coercion in the exercise of the electoral franchise."

But the constitutional thesis of *coercion or lack of free will by unconscious association* has several pitfalls. It is not based on the mere similarity between a coconut palm tree and a royal palm tree on its graphical reproduction in the ballot, which difference may be easily perceived if the emblem of the coconut palm tree is correctly printed in the ballot. The thesis of unconscious association and of coercion in the exercise of the electoral franchise is based, more than on

the similarity itself of the emblems, on a fact which, according to the Supervisor, arises from the plebiscitary campaign previous to voting, that is, that both palms were used during the campaign, and that the partisans of the Statehood status did not say "vote under the royal palm tree," but the motto was "vote under the palm tree"; and from this fact it is inferred that if the use of the emblem of the coconut palm tree is permitted in the election of 1968, the motto would be the same, that is, "vote under the palm tree," and hence the theory of the confusion of the voter and the lack of free will of his vote.

A thesis cannot be elaborated on the violation of the conscious exercise of the right to vote, presupposing the unconsciousness of those who are going to exercise it. The legislative prohibition cannot be given a connotation of punishment to the citizen because the latter in the plebiscitary campaign made use of other constitutional rights which belong to him, and which he can use incidentally in that electoral process—as the freedom of thought, speech, assembly, and press.

Section 4 of the Election Law itself (16 L.P.R.A. § 5) provides that "the elections shall be free and equal. . . ," and § 1 of the Plebiscite Act provided that the latter would be "in a free, impartial, and democratic manner." Although it was provided in § 19 of the Plebiscite Act that no official emblem characteristic of a political party would be included in the ballot, it was not prohibited to the political parties which would go to the plebiscite to use and identify themselves during the campaign, together with the plebiscite emblem representing its status formula, their own emblems or the official characteristic emblems, except within the polling places within a radius of less than 100 meters of said polling places, as provided by § 86 of the Plebiscite Act itself.

To accept the Supervisor's argument of *coercion or lack of free will by unconscious association*, if in the elections of 1968 the use of the emblem of the coconut palm tree, is permitted, because of its similarity with the royal palm tree, would be like accepting that the Legislature—in permitting the use in the plebiscitary campaign, although not in the ballot, of the emblems or official characteristic emblems of the political parties which as such defended their respective status formula—vitiated the plebiscite from the beginning with the very stigma of lack of will on part of the plebiscite voters which it now conversely attributes to the use of an emblem in the ballot of 1968 which was not the one which appeared in the plebiscite ballot, and which can be distinguished from it. Said implication must be rejected. We cannot attribute to the Legislature such *brutum fulmen*. The position of the Board can do unnecessary harm to the image of the plebiscite on the political status, without doing any good to the image of electoral democracy.

■ In view of the foregoing considerations we decide that the Board erred in declaring illegal the use of the coconut palm tree as emblem of a political party in the ballot of 1968.

## X

The Supervisor's decision that if the use of said emblem were permitted, "preference is given to the Federal Unionist Agrarian Party, which was the one which was registered first in the Precinct of Culebra," is equally erroneous, because of the following reasons:

1—The letter dated August 1, 1967 of Modesto Rivera Ramos addressed to the Supervisor informing him of the purpose of commencing the registration of a political party by petition, named Federal Unionist Agrarian, with the four emblems to which we referred in subdivision III of this decision (among them two coconut palm trees), does not

establish, at law, any priority in favor of said political group over the Federate Progressive Party which filed, with the office of the Commonwealth Board of Elections in San Juan on August 2, 1967 at 12:08 p.m. of that day, 42 petitions for registration of candidates for the election precinct of Culebra with the emblem of the coconut palm tree among others.

Pursuant to § 37 of the Election Law the manner of nominating candidates by petition is initiated by filing "a petition in the Commonwealth Board of Elections setting forth the names of candidates nominated in the same. . ."; and said petitions "shall be filed in the office of the Commonwealth Board of Elections not later than 12:00 noon of the first day of June of the election year. . . ." Modesto Rivera Ramos' letter, announcing his aim of commencing the registration of the Federal Unionist Agrarian party, does not comply with the aforecited provisions, since no petition nominating candidates was filed with it, as required by law and therefore, it cannot establish by itself the right of priority over the group which in effect filed its petitions for registration with the Board. The group Federal Unionist Agrarian filed its first petitions with the office of the Commonwealth Board of Elections on August 2, 1967 at 1:28 p.m., that is, after the group Federate Progressive Party filed them; and said petitions, which were only two, did not belong to the precinct of Culebra, but to the precinct of San Juan I. It was not until August 3 that the group Federal Unionist Agrarian filed with the Board the first four petitions for registration belonging to the precinct of Culebra.

■ 2—The group Federal Unionist Agrarian Party did not file with the Board petitions for registration to cover the numerary quota of 32 corresponding to the 10% necessary for the registration of local candidates in Culebra, until March 27, 1968. The group Federate Progressive Party had

covered the numerary quota corresponding to said 10% in Culebra since August 2, 1967.

3—The New Party, which in the month of January 1968 was registered as party by petition for all the election precincts of Puerto Rico, by General Assembly of delegates of the 87 precincts held on February 18, 1968, agreed to join the political group Federate Progressive Party which had already filed with the Board, as we have said, its 42 petitions for registration for the precinct of Culebra, and which, also, had already filed, since the end of August, 870 petitions for the precinct of Cataño, sufficient to cover the numerary quota of 10% to be registered as local party in said precinct. It also agreed, as a result of the union, to change the name to New Progressive Party and to use as the only emblem the coconut palm tree.

4—The political group Federate Progressive Party, in assembly of its members held on March 10, 1968, agreed, on its part, to join the New Party so that only one party would exist under the name New Progressive Party, and to use as the only emblem the coconut palm tree. The corresponding agreements were adopted so that from the time the merger, union or consolidation of both parties into a single one was carried out, the Central Directing Organism would be the one of the New Party at that time.

5—On March 19, 1968 the central directing committees of the New Party and of the Federate Progressive Party met, and the union, merger or integration of both parties was consummated, according to the separate agreements of their respective assemblies, all the corresponding agreements having been ratified.

6—The documents establishing the agreements of said assemblies, and of the central directing organisms were filed with the Commonwealth Board of Elections on April 5, 1968.

7—When the integration of the New Party and of the group Federate Progressive Party was consummated on

March 19, 1968, the registration rights acquired by the group Federate Progressive Party, as to name and emblem, derived from their registration in the precinct of Culebra, were merged into the New Party since the aforementioned date. Because of said reason the New Progressive Party has the right to the use of the coconut palm tree as emblem over the local group Federal Unionist Agrarian Party of the precinct of Culebra.

8—By virtue of the consolidation of the rights of the Federate Progressive Party in the New Party, as we have indicated, as well as by the mere consent of the former so that the latter adopt and use the emblem of the coconut palm tree, said emblem belongs to the New Progressive Party against the claim of the Federal Unionist Agrarian Party.

9—The claim made by the People Party on June 29, 1968 for the use of the emblem of the coconut palm tree does not lie because the claim of the New Progressive Party is more lawful.

The reasons set forth above establish the grounds of fact and of law because of which the Supervisor erred in awarding the emblem of the coconut palm tree to the Federal Unionist Agrarian Party against the claim of the New Progressive Party, which has the right to use it as its election emblem.[7]

In view of the foregoing, the decision of the Commonwealth Board of Elections of July 22, 1968, issued by the

---

[7] On the basis of the conclusions we have reached in this decision it would be a mere *dictum* to declare that under the actual state of the Election Law, and under the specific facts which concur herein, the New Progressive Party would have had the right to appear in the ballot of 1968 with the emblem of the coconut palm tree, as proposed, in all the other precincts of Puerto Rico, except in the precinct of Culebra, in which it could nominate its candidates, but could not use said emblem, assuming that the political group Federal Unionist Agrarian Party would have had more right than the former to the use of the emblem of the coconut palm tree in said precinct, since the registration of a local candidate becomes effective only in the precinct in which it is registered, and it cannot have electoral juridical consequences outside of said precinct.

opinion of the General Supervisor of Elections, is hereby reversed, and it is held that the New Progressive Party is entitled to the use of the emblem of the coconut palm tree, as proposed to the Commonwealth Board of Elections, for all electoral purposes. The General Supervisor of Elections is ordered to carry out whatever steps are necessary so that said emblem appear in the ballot of 1968 corresponding to said party.